YARRUT, Judge.
Plaintiff appeals from a judgment of the District Court denying him workmen’s compensation not to exceed 398 weeks at $30 per week, for an injury to his lower back. The only dispute is the nature and duration of the injury. There is no dispute over his employment, nature of employment or wages of $1.10 per hour for a 40-hour week. There is some dispute as to when the disabling injury was sustained.
While Defendant employer’s insurer alone answered admitting Plaintiff was injured on July 17, 1956, as alleged, the employer’s' foreman testified that on July 17, 1956, when Plaintiff first advised him of the fact, Plaintiff stated he suffered his injury two months before. The controlling facts are:
While employed by Kieckhefer Container Co. as a baler operator, Plaintiff injured his back in attempting to raise or move a bale of cardboard weighing approximately 800 pounds on a hand truck. Around 9:30 A.M. or 10:00 A.M. on July 17, 1956, he told his foreman that he hurt his back. When asked when he hurt his back, he said “about two months before.” He was given a card and sent to the Fisher-Rabin Medical Center. He did not return to work that day (Tuesday) but did work on the following Wednesday, Thursday, Friday and Monday. He did not return to work on the following Tuesday, and never went back to the Defendant’s plant again. Dr. Herman Rabin, of the Fisher-Rabin Medical Center, on August 10, 1956, reported to Defendant Insurance Company that Plaintiff had fully recovered from any injury he might .have received, and was being discharged as of that date.
Whereas Plaintiff, on direct examination, testified he was living with his pregnant wife and five children; when, on cross-examination, he was asked when he was married, testified he was not married; that two of the five children were his, and “three of them by somebody else.” The “wife” did not testify as to his condition. Two of his neighbor friends testified they visited him while suffering with his back, and one massaged him frequently. Their testimony did not impress us any more than it did the trial judge. The result therefore must depend upon the medical testimony, viz.:
Plaintiff’s medical witnesses were Drs. O. L. Pollingue and Irvin Cahen. Dr. Pollingue examined Plaintiff on August 29, 1956, and found a band of hypesthesia over the posterior aspect of the left calf, and also some hypesthesia over the lateral aspect of the right calf as compared to the inner side of the right calf; that there was a relationship between his hypesthesia and Plaintiff’s disability because the hypes-thesia was due to some nerve root pressure. To the contrary, Dr. Cahen testified he could not find any hypesthesia or paresthesia, and, furthermore, could not find any evidence of nerve root' pressure. Dr. Pollingue first testified Plaintiff should be fitted with a wide lumbosacral support, and later testified he found Plaintiff “was wearing a sacroiliac belt with a pad in the back.”
Dr. Pollingue further testified the x-rays showed “a spina bifida occulta at L-5,” and that in the lateral projection, L-5 was noted to be displaced forward in relationship to both L-4 and the sacrum; and that this forward displacement was a first degree spondylolisthesis, notwithstanding Dr. Cahen testified that the variation in the development of the articulations at the lumbosacral juncture suggested spondy-lolysis without spondylolisthesis.
On cross-examination Dr. Pollingue testified that the back defect was a congenital defect in the bone; and with the exception of the finding of spondylolisthesis, and the band of hypesthesia, which was subjective and not objective, all of the *78 other portions of Plaintiff’s back and body were normal.
Dr. Cahen (orthopedist) examined Plaintiff on November 27, 1956. He testified when he saw Plaintiff in November of 1956 he complained of pain in the lower back; that he had discomfort on coughing and sneezing, and also some numbness in his leg which he claimed had developed since the date of injury, and he had noted some numbness in his arm as well; that he examined Plaintiff from an orthopedic standpoint and had some x-,ray studies made of his back; that there was a flattening of the lumbar portion of the back, but could not find any atrophy of the muscles; nothing in the joints of the lower extremities that he considered to be abnormal; was unable to note any paresthesia; did not find any evidence that he would interpret as indicative of nerve root pressure; found a defect in his back, known as spondylolisis, but could not find any evidence that would indicate a slippage between the two vertebrae. It is the slippage between the two vertebrae which would be known as “spondylolisthesis” and not “spondylolisis”; that the x-ray studies made by Drs. Teitelbaum and Southard showed a variation in the development of the zygapophysial articulations at the lumbosacral juncture, which suggested spondylolisis without spondylolisthesis, and that he (Dr. Cahen) was in agreement with that report.
Dr. H. R. Soboloff (orthopedist) for Defendants, testified he examined Plaintiff on August 8, 1956; that Plaintiff complained of a stiffness in the mornings on arising, but which, with activity, improved; that in the past few weeks before the examination he had noticed some numbness in the left leg down to the knee; that, notwithstanding these complaints, the examination revealed Plaintiff could undress with ease, carrying his back through a full range motion; that he did not wince in the process of removing his shoes, although his back was fully and completely flexed; that at that time he stood erect with no visible list or scoliosis, but when asked to move his back through a full range of motion, he was afraid to do so, and, when he did so, it revealed restrictions at all extremes, and that these were voluntary restrictions; that there was no evidence of muscle spasm or tightness in the lower back; that in the erect position pressure over his lumbosacral joint caused him no discomfort; and that in the sitting position straight leg raising tests were found to be negative. That after his examination of Plaintiff he came to the opinion that:
“ * * * in view of the fact that this man could carry his back through a normal range of motions while undressing, and in a sitting position the tests were negative, and when he was in a supine position and you asked him to do these other things he cannot do them and yet you find no reason mechanically or. from an orthopedic standpoint why he could not do them, and then the condition in his back is what we call a congenital condition, something he was bom with, and not as a result of this particular injury, but had at birth and will have the rest of his life, and since I couldn’t find any residual of the injury, I felt he had recovered and could return to doing the same type work he had been doing at the time of the injury * *”
Dr. Soboloff explained there was a marked difference between spondylolis-thesis and spondylolisis, a spondylolisis being a dissolved spine, and a spondylolis-thesis being the slipping forward of one vertebra or another; and the x-rays did not show any slipping, hence no spondylo-listhesis. As quoted above, Dr. Soboloff explained the dissolved spine was congenital, something Plaintiff had at birth and would remain with him throughout life; hence, did not result from the accident.
Dr. Rabin of the Fisher-Rabin Medical Center, addressed to the American Mutual *79 Liability Insurance Company a .report dated August 10, 1956. It was stipulated between counsel that Dr. Rabin was a surgeon, and that if he were placed upon the witness stand he would testify in accordance therewith. In that report Dr. Rabin goes fully into his opinion of what he referred to as “the original injury,” the repeated observation that he made of Speed, the test he was put to and, finally, said:
“Under these circumstances, we feel that this patient is fully reovered from his injury and the congenital defect in his back has in no way been exaggerated by the injury. The patient is being discharged as of this date.”
Plaintiff himself merely testified that he was treated by the Fisher-Rabin Clinic for about three or four weeks when he was discharged, but that when they discharged him he was not able to .return to work. This was the total extent of Plaintiff’s own testimony.
Herman Charrier, the employer’s foreman and Plaintiff’s boss, in addition to testifying principally that when Plaintiff told him for the first time of his injury on Tuesday, July 17, 1956, he stated he suffered the injury two months earlier; and that Plaintiff worked the following Wednesday, Thursday, Friday and Monday, and that was the last he heard from him. Plaintiff, however, testified that when he returned on Wednesday, following his notice to Charrier, he was put on light work, and when Charrier asked him if he could resume his regular baling, he answered “no,” so Charrier said, “That will be it.” Charrier’s testimony was that the work was slow and Plaintiff took a couple of days off and was to report later, but he never saw Plaintiff again.
Our conclusion, as it must have been that of the District Judge, is that Plaintiff had a congenital back abnormality, that was aggravated by the bale-loading incident, but that the aggravation was of only a few weeks duration (not more than three) for which he was paid full wages or compensation.
The medical testimony conflicts only with regard to the duration of the aggravation, but preponderates in favor of Defendants ; hence, Plaintiff has not sustained the burden of proving his inability to resume his former duties. Having failed to sustain the burden of proof, Plaintiff’s suit was properly dismissed. Guillory v. Employers Mutual Liability Insurance Co. of Wisconsin, La.App., 110 So.2d 188; Sims v. Times-Picayune Publishing Co., La.App., 128 So.2d 444, and authorities therein cited.
For the reasons assigned, the judgment of the District Court is affirmed. •
Judgment affirmed.